FILED
United States Court of Appeals
Tenth Circuit

October 1, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

JAMES S. PHILLIPS, JR.,

        Defendant-Appellant.

_____

No. 07-3135

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

ALICIA MORALES-PHILLIPS,

        Defendant-Appellant.

No. 07-3143

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. No. 06-CR-10001-WEB)**

---

William D. Lunn, Tulsa, Oklahoma, for Defendant-Appellant James S. Phillips, Jr.

Kari S. Schmidt, Conlee Schmidt & Emerson, LLP, Wichita, Kansas, for Defendant-Appellant Alicia Morales-Phillips.

Brent I. Anderson, Assistant United States Attorney (Eric F. Melgren, United States Attorney, with him on the brief), Wichita, Kansas, for Plaintiff-Appellee.

_____

Before **HENRY**, Chief Circuit Judge, **BRORBY**, Senior Circuit Judge, and **McCONNELL**, Circuit Judge.

_____

**McCONNELL**, Circuit Judge.

_____

In 2007, a jury convicted James S. Phillips, a partner at the Phillips and Phillips Chartered Law Firm, and his wife and secretary, Alicia Morales–Phillips, of eight counts of willingly making a false statement to a federal agency in violation of 18 U.S.C. § 1001 and eight counts of immigration fraud in violation of 18 U.S.C. § 1546(a). Both defendants appeal, arguing that the court improperly admitted several significant documents and that the conduct underlying the § 1546(a) convictions does not fall within the scope of that statute. Mr. Phillips additionally argues that the evidence was insufficient to convict him on any of the charges. We agree that the defendants' conduct does not fall within the plain language of § 1546(a), but we reject the defendants' evidentiary and sufficiency of the evidence challenges. We therefore affirm on some of the counts and reverse on some of the counts.

## I. Facts

### *A. Background*

James Phillips ran a law firm of about fifteen employees, one of whom was Alicia Morales-Phillips, his wife. During the relevant time period, he was the only lawyer at the firm. Among other legal work, the firm assisted undocumented workers with preparing and filing applications for permission to remain in the United States for employment purposes. These forms, called "Applications for Alien Employment Certifications" or "ETA-750s," are the means by which foreign workers initiate the process to obtain an employment-based visa from the United States Department of Labor. 8 U.S.C. § 1182(a)(5)(A). Filling out the ETA-750 is the first of three steps that must be completed before the alien can receive the visa. *Matovski v. Gonzales*, 492 F.3d 722, 726–27 (6th Cir. 2007); *United States v. Ryan-Webster*, 353 F.3d 353, 355–56 (4th Cir. 2003). A successful applicant receives a certification from the Department of Labor informing the Secretary of State and the Attorney General that the alien fills a crucial niche in the American labor force that cannot otherwise be met. Only after the alien receives this certification can he apply for an employment-based visa. 8 U.S.C. § 1153(b)(3)(C) ("An [employment-based] immigrant visa may not be issued to an immigrant . . . until the consular officer is in receipt of a determination made by the Secretary of Labor pursuant to the provisions of [section 1182(a)(5)(A) of this title].").

To obtain approval from the Department of Labor, the applicant must have a sponsoring employer who certifies that "efforts were made, unsuccessfully, to recruit American citizens for the specific position." *United States v. Ramirez*, 420 F.3d 134, 137 (2d Cir. 2005). An attorney may act on behalf of the employer, but to do so must file an INS Notice of Entry of Appearance as Attorney or Representative, (G-28) with the Department of Labor. *See Ryan-Webster*, 353 F.3d at 356. The applicant also must attest, on the form, that he or she is qualified for and willing to fill that particular position. After examining the application, the administering state agency, acting as an arm of the Secretary of Labor, must determine and certify to the Secretary of State and to the Attorney General that the employer's claim is accurate, and that the "employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C.A. § 1182(a)(5)(A)(II). The relevant certifying agencies here are the Kansas Foreign Labor Certification Unit of the Kansas Department of Corrections and the Missouri Foreign Labor Certification Program.

On April 30, 2001, Ms. Morales-Phillips brought a stack of ETA-750s into the Kansas Foreign Labor Certification Unit. According to Manager Jane Burbridge, this was a particularly busy day, as it was the filing deadline prior to the expiration of the Family LIFE Act, a federal law which allowed undocumented aliens to remain in the country while seeking lawful permanent

residency through labor certification. Ms. Morales-Phillips remained in the office for several hours and worked on the applications, eventually turning in 15–20 applications to Ms. Burbridge.

In September of 2002, the Kansas Certification Unit began review of ETA-750s, including those submitted by the Phillips' law firm. Ms. Burbridge noticed a discrepancy between some forms submitted by the Phillips' law firm and those submitted by another attorney group. Specifically, the Phillips law firm listed a considerably lower wage for practically the same job from the same company (Acme Foundry) than did another attorney group that submitted an application. Ms. Burbridge also noticed that the employer signatures on the forms did not match despite the fact that they were allegedly from the same employer, Jason Zimmerman of the Acme Foundry company. Puzzled, Ms. Burbridge contacted Mr. Zimmerman, who informed her that the signature on the ETA-750 submitted by the Phillips law firm was not his, and that he had not authorized anyone at the firm to act as his agent or sign for him.

After reviewing several other applications from the Phillips law firm that she did not think "look[ed] right," Ms. Burbridge contacted Special Agent Kilcoyne at the United States Department of Labor. Agent Kilcoyne conducted an extensive review of all the ETA-750s submitted by the Phillips law firm. The investigation eventually revealed fraudulent ETA-750 applications with forged signatures from six employers, as well as a forged signature on an Application for

Asylum Form I-589.  Additionally, though employer Albert J. Kramer, Jr. originally signed an ETA-750 application, that form was returned to the Phillips law firm because it was sent to the wrong office.  When the law firm refiled the form, the signature date was altered.  But by the time of the second filing, Mr. Kramer was dead, making it impossible for him to have signed on the listed date.

During an arrest interview, Ms. Morales-Phillips admitted to signing some of the employer and alien names, though she claimed that she had been authorized by some of the employers to sign on their behalf.

On January 11, 2006, James Phillips and Alicia Morales-Phillips were indicted and charged with eight counts of knowingly and willfully making and using a false writing and document by presenting ETA-750 forms to the Department of Labor, knowing them to be false, in violation of 18 U.S.C. § 1001. They were also charged with eight counts of knowingly and willfully forging and falsely making a document prescribed by statute and regulation for entry into and as evidence of authorized stay and employment in the United States in violation of 18 U.S.C. § 1546(a).  Each was charged with aiding and abetting the other's conduct.  18 U.S.C. § 2.

### *B. Trial*

Mr. Phillips and Ms. Morales-Phillips were tried jointly before a jury. The government introduced the testimony of six employers on behalf of whom

the Phillips law firm filed ETA-750s: Brian Jennings of Superior Frame Company, Jason Zimmerman of Acme Foundry, Keith Huffman of Hill Huffman Construction, Eric Cromer of Cromer Livestock, Kerry Cromer of Patty John Quarter Horses, and Joe Dodson, proprietor of an electric motorshop. All denied that they had authorized either of the defendants to sign the forms on their behalf. Eric Cromer testified that he had initiated the ETA-750 filing process for several employees by paying the firm $500.00 and providing information about his company, but that he had not authorized the firm to sign the form on his behalf, nor was he aware that anyone at the firm had submitted the form until he was later contacted by investigators. Kerry Cromer testified that he had never spoken to the defendants and had no knowledge that the labor certification applications existed. Brian Jennings testified that he had met with Ms. Morales-Phillips twice and paid $500, but that he did not think that he had signed his name on any forms. Mr. Dodson testified that while he had communicated with Ms. Morales-Phillips about getting "legal status" for an employee, he had not signed any forms nor authorized someone to sign for him. Mr. Zimmerman similarly denied filling out any forms, as did Keith Huffman and Joe Dodson.

The government also presented the testimony of Ms. Elpidia Solorazano, who had hired the Phillips law firm to help her obtain work and residency permits for her family. After meeting with Ms. Morales-Phillips, she paid the firm $2,000 and agreed to pay an additional $4,000 in the future. She later received a rejected

I-589 application for asylum from the United States Citizenship and Immigration Office in Nebraska. Ms. Solorazano testified that someone had forged her signature on the application and that she was never informed that the firm would be filing an asylum application on her behalf.

While many of these witnesses testified that they had contact with Ms. Morales-Phillips, none claimed to have met with or spoken to Mr. Phillips.

The government also presented the testimony of a former paralegal from the law firm, Odelia Bryer. She testified that she was familiar with both Mr. Phillips' and Ms. Morales-Phillips' handwriting, that the signatures on all of the ETA-750s were in Ms. Morales-Phillips' handwriting, and that the handwriting on the application for asylum was Mr. Phillips'. Dorothy Billings, Mr. Phillips' ex-wife, testified in rebuttal that the handwriting on the I-589 document was not Mr. Phillips'.

Ms. Burbridge described the irregularities she discovered in the Phillips' applications. She informed the jury that when the agency received ETA-750s, her office sent postcard notices to the agents listed on the forms, notifying them that the paperwork was received. She also testified that she had spoken with Mr. Phillips over the phone on occasion about some of the applications filed by his firm, though she could not remember the substance of those calls. Special Agent Phil Barbour also testified about his interview with Ms. Morales-Phillips on the occasion of her arrest.

At the close of trial, the defendants moved for a judgment of acquittal, which the court denied. The jury then convicted the defendants on all counts, and the district court sentenced each to three years' probation, a downward departure from their guidelines range of 15–21 months. Mr. Phillips and Ms. Morales-Phillips appeal their convictions.

## II. Analysis

### A. Evidentiary Issues

We first address the defendants' evidentiary claims. Both argue that the district court violated: (1) the rule of completeness when it admitted a partial I-589 application; (2) the best evidence rule when it admitted a copy of the I-589 application; and (3) Federal Rule of Evidence 1005, governing the admissibility of public records, when it admitted copies of the ETA-750s. We review the district court's evidentiary rulings for abuse of discretion, and affirm those rulings in all respects. *United States v. Samaniego*, 187 F.3d 1222, 1223 (10th Cir. 1999).

### 1. Rule of Completeness

The rule of completeness, as set forth in Federal Rule of Evidence 106, provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." As the Supreme Court has explained,

under this rule "the opponent, against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171 (1988) (internal quotations omitted). The defendants argue that the district court violated Rule 106 when it admitted into evidence only four of the twelve pages of the I-589 document.

The defendants argue that the remaining eight pages of the I-589 form, which set forth personal information about Ms. Solorazano that could only have been obtained had she been actively involved in the application process, would have benefitted the defense. App. Br. 32. That might be true, but it does not render admission of the incomplete document an error. Rule 106 does not prohibit admission of an incomplete document. Instead, it allows the party against whom the document is introduced to place the remainder in evidence without additional evidentiary foundation. *Beech Aircraft Corp.,* 488 U.S. at 171. If the defendants wanted the remainder of the document to be admitted, they should have offered it. As this Court said in *Worden v. Tri-State Ins. Co.*, 347 F.2d 336, 341 (10th Cir. 1965), "[i]t is fundamental that one side may introduce only a part of a document or deposition in evidence, but of course it is also well recognized that the other side may later introduce more or the rest of any such document or deposition which was not introduced in evidence."

-10-

## 2.     *Best Evidence Rule*

Invoking the so-called "best evidence rule," the defendants also challenge the admission of an I-589 application filed on behalf of Ms. Solorazano, containing what she testified to be a forged signature. The best evidence rule, set forth in Federal Rule of Evidence 1002, holds that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." This general provision is followed by a series of rules allowing the admission of duplicates under certain circumstances, unless "a genuine question is raised as to the authenticity of the original" or "in the circumstances it would be unfair to admit the duplicate in lieu of the original."   Fed. R. Evid. 1003.  The district court found that two of these exceptions were applicable: the original "could not be obtained by any available judicial process or procedure," making the copy admissible under Rule 1004(1), and the I-589 application was an "official record" admissible under Rule 1005.

The district court found that there was no "genuine question" as to the "authenticity" of the admitted copies of the I-589 application and "no unfairness in their admission," Dist. Ct. Op., at 20.[1]  In his brief, Mr. Phillips argues that it

---

[1] It is not certain that this document was a copy, in light of Ms. Solozaro's testimony.  At trial, the prosecutor asked: "The pages shown in 15-1, did you ever photocopy those?" Ms. Solorazano responded in the negative.  The prosecutor continued: "Those are the original pages that you received from immigration

(continued...)

was not clear how the government obtained the copy of the application that was introduced at trial, raising a question as to its authenticity. But although he objected at trial to the document's admission because it was a copy, he did not make any objection to its authenticity. Defense counsel specifically stated: "[The objection] is [that the document] is the copy and it is not the complete document." R. Vol. V, at 85. That was not sufficient to raise an issue regarding its authenticity. *See Tyson v. Jones & Laughlin Steel Corp.*, 958 F.2d 756, 761 (7th Cir. 1992).

In any event, the government adequately established the document's authenticity. Ms. Solorazano identified the document as the application she received from the Citizenship and Immigration office, and testified that the document offered at trial was in the same condition as when she received it. There is no reason to question the district court's finding that there was no "genuine issue" as to the authenticity of the copy, and it was appropriately admitted under Federal Rule 1003.

---

[1](...continued)
when you opened up the letter?" Ms. Solorazano confirmed. From this testimony, it seems that the government offered the original document. Because the government does not argue that this is an original on appeal, however, we will treat it as a copy.

### 3.    *Public Records*

The defendants also object to the admission of copies of four handwritten ETA-750s, arguing that their entry into evidence violated the rule for admission of public records.  Federal Rule of Evidence 1005 holds that

> [t]he contents of an official record, or of a document authorized to be recorded or filed and actually recorded or filed . . . if otherwise admissible, may be proven by copy, certified as correct in accordance with rule 902 or testified to be correct by a witness who has compared it with the original.  If a copy which complies with the foregoing cannot be obtained by the exercise of reasonable diligence, then other evidence of the contents may be given.

No government witness testified to having compared the duplicates to the original, and the copies were not certified under Federal Rule of Evidence 902.  Therefore, to admit the documents under Rule 1005, the government was required to prove that it could not obtain the original or a compliant copy through the exercise of reasonable diligence.

In response to the defendant's objection to the admission of a copy, the district court held that "as of the time of trial the originals were either lost or not obtainable through the exercise of reasonable diligence or available judicial process."  Dist. Ct. Op. 21.  The defendants challenge that conclusion on appeal.  We review the district court's decision to admit the evidence for abuse of discretion, and its factual finding that the originals were not obtainable through the exercise of reasonable diligence for clear error.  *See United States v. Samaniego*, 187 F.3d 1222, 1223 (10th Cir. 1999); *see also United States v.*

*Townley*, 472 F.3d 1267, 1277 (10th Cir. 2007). We find neither clear error nor an abuse of discretion. At trial, Ms. Burbridge testified that her office had such a high backlog of ETA-750 applications immediately following the LIFE Act deadline that they were forced to send many applications to the Dallas office of the Department of Labor for review. Many of those filed by the Phillips law firm were sent to Dallas. The prosecutor informed the court that the government had "tried [to retrieve the documents] and there's just no way that we can get the original back," expressing his frustration that Dallas was like "a black hole." Ms. Burbridge testified that while she could "probably [retrieve an original from Dallas] if it was requested, it might take awhile." The district court did not abuse its discretion when it found that the government exercised reasonable diligence in its attempt to obtain an original copy, and could therefore introduce a copy instead. Fed. R. Evid. 1005.

## B. The Scope of § 1546(a)

In the indictment, the government charged the defendants with eight counts of "knowingly and willfully forg[ing] and falsely ma[king] a document prescribed by statute and regulation for entry into and as evidence of authorized stay and employment in the United States," in violation of 18 U.S.C. § 1546(a). That section provides, in relevant part:

> Whoever knowingly . . . utters, uses, [or] possesses . . . any such visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or

-14-

as evidence of authorized stay or employment in the United States, knowing it to be forged, counterfeited, altered, or falsely made [is guilty of a felony].

Relying on *United States v. Ryan-Webster*, 353 F.3d 353, 357 (4th Cir. 2003), the district court held and the government argues that § 1546(a) applies to forgeries not only of entry documents but of documents required to be submitted as a prerequisite to receiving entry documents. The defendants, by contrast, argue that the ETA-750s and the I-589 applications are not "other document[s] prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States," and so their convictions under this statute must be vacated. Reviewing this question of statutory interpretation de novo, *United States v. Moore*, 420 F.3d 1218, 1220 (10th Cir. 2005), we agree with the defendants that the forged documents in this case are not prescribed by statute for entry into or evidence of authorized stay or employment, and vacate the convictions obtained under § 1546(a).

We first look to the statute's plain language to determine its meaning. *United States v. Romero*, 122 F.3d 1334, 1337 (10th Cir. 1997). Section 1546(a) prohibits forgery of a document "prescribed by statute or regulation *for entry into or as evidence of* authorized stay or employment in the United States." (emphasis added). As explained above, filling out the ETA-750 is the first out of three steps that must be completed before the alien can receive a visa under U.S.C. § 1182(a)(5)(A)(I). It is this visa, not the ETA-750, that has been prescribed for

-15-

entry into, and stay or employment within, the United States. An alien seeking to cross the border or to prove eligibility for employment would get nowhere by flashing an ETA-750. An ETA-750 is no more a "document prescribed for entry . . . or as evidence of authorized stay or employment" than an application for a credit card is a credit card. Similarly, an I-589 is a form used by an individual afraid for his life to appeal for prevention of removal to his home country. It is a prerequisite for obtaining legal status, but it does not grant or prove legal status. As the dissenting judge in *Ryan-Webster* put the point, the ETA-750 and I-589 forms "are simply applications, representing nothing more than the applicant's and/or his employer's desire that the applicant gain the right to enter or remain in the country legally." *Ryan-Webster*, 353 F.3d at 366 (Williams, J., dissenting).

This interpretation of the statutory language is reinforced by the statute's enumerated examples. Before using the catchall phrase "other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States," the statute enumerates certain documents whose forgery is proscribed: "any such immigrant or nonimmigrant visa, permit, border crossing card, [or] alien registration receipt card." 18 U.S.C. § 1546(a). Each of these items is a document that provides proof that the individual has legal permission to be in the country. None of the enumerated items is merely an application or other prerequisite to obtaining such permission. *See* 8 U.S.C. § 1101(a)(16) (defining "immigrant visa"); *id*. § 1101(a)(6) (defining "border

crossing identification card"); *id.* § 1304(d) (defining "alien registration receipt card").  Under the venerable interpretive canons of *noscitur a sociis* and *ejusdem generis*, the meaning of a catchall phrase is given precise content by the specific terms that precede it.  *See United States v. Williams*, 128 S. Ct. 1830, 1840 (2008); *Begay v. United States*, 128 S. Ct. 1581, 1584-85 (2008); *Hall Street Assoc., L.L.C. v. Mattel*, Inc., 128 S. Ct. 1396, 1404 (2008); *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004).  An application for a permit to remain in the United States, or to reenter the United States, is different in kind than the actual authorizing document.  This statute applies to the latter, not the former.

It is also significant that a separate paragraph of § 1546(a), under which the defendants were *not* charged, holds that:

> Whoever knowingly makes under oath, [or] . . . subscribes as true, any false statement with respect to a material fact in any *application*, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such *application*, affidavit, or other document which contains any such false statement . . .

is subject to criminal punishment under the statute.  § 1546(a) ¶ 4 (emphasis added).  This bolsters our conclusion that Congress did not intend to punish forged applications in the section charged in the indictment.  If "other documents" in the first paragraph were interpreted to include not only final documents, but applications as well, there would be no need for Congress to include paragraph

-17-

four at all, let alone the specific reference to applications. We decline to adopt a reading that renders an entire paragraph of the statute superfluous. *National Association of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2536 (2007) ("[W]e have cautioned against reading a text in a way that makes part of it redundant."); *see also TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Additionally, the use of "application" elsewhere in the statute demonstrates that Congress was aware of how to punish application fraud when it so intended. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242 n.4 (1989).

The district court followed the Fourth Circuit's holding in *Ryan-Webster*, holding that "Congress clearly intended in § 1546(a) to proscribe all types of forgery and fraud in connection with immigration documents that could be used to gain entry or as evidence of authority to stay or work in the U.S.," and that "[f]alsely made applications of this type can be ultimately used as a means to gain unlawful entry or to support an improper claim for authorization to stay or work in the United States." Dist. Ct. Op. at 23. According to the district court, filing an ETA-750 and an I-589 was a "critical step[]" toward obtaining entry, and so the statute applied. With all respect to our sister Circuit, as well as the district court, we do not read the statute this way. A document "for entry into or as evidence of authorized stay or employment into the United States" provides proof of an individual's right to either be in or enter into the country. The I-589s and ETA-750s do not provide this verification. The document itself does not

-18-

authorize entry. It does not even indicate whether the DOL has certified that the alien has acquired potential employment, or whether the INS has found that the individual's life really is at risk if sent away.

The government points out that in 1986, the Supreme Court interpreted a prior version of § 1546(a), which held liable "whoever . . . knowingly forges . . . [another] document required for entry into the United States." *United States v. Campos-Serrano*, 404 U.S. 293 (1971), as not applying to counterfeit alien registration cards. The Court narrowly construed the phrase "required for entry," stating: "[t]he language of § 1546 denotes a very special class of 'entry' documents—documents whose primary *raison d'etre* is the facilitation of entry into the country." *Id.* at 299. The Court concluded that counterfeit alien registration cards did not fall within the statute's scope because, while they *could* be used to reenter the country, their primary purpose was to "effectuate the registration requirement for all resident aliens," and not to facilitate entry. *Id.* at 296, 300. In response to the Court's decision, Congress amended and expanded § 1546, replacing the phrase, "document required for entry into the United States," with the phrase, "document prescribed by statute or regulation for entry." The government argues that, because Congress intended to broaden the statute, we should read the amended statute to reach all documents that facilitate the alien's ability to obtain legal entry in the future.

This argument is unpersuasive for several reasons. First, we do not look to congressional intent when the statute's language is plain. "Going behind the plain language of a statute in search of a possibly contrary congressional intent is a step to be taken cautiously even under the best of circumstances." *United States v. Locke*, 471 U.S. 84, 95–96 (1985) (internal quotations omitted). The language must be ambiguous before we will consider such intent, and here, it is not. But additionally, we believe that our interpretation comports with Congressional intent. The amended language is best read to include all documents that *can be* used to legally enter the country, even if the document's primary purpose is not to facilitate entry. There is no reason to think Congress intended to bring mere applications within its reach. This reading brings the alien residency cards at issue in *Campos-Serano* within the statute's ambit, without encompassing documents, such as ETA-750s and I-589s, which cannot be used to obtain entry.

Because ETA-750 and I-589 applications do not fall within the first paragraph of § 1546(a), we reverse the convictions on Counts 2, 4, 6, 8, 10, 12, 14, and 16 for both Mr. Phillips and Ms. Morales-Phillips.

### C. Sufficiency of the Evidence

At the close of the government's case and again after the jury returned the guilty verdicts, Mr. Phillips moved for a judgment of acquittal based on the insufficiency of the evidence. He renews this argument on appeal with respect to

all of the claims,[2] making a separate argument for Counts 5 and 6, which dealt with the altered date on the A.J. Kramer application.   We review the sufficiency of the evidence claims de novo, *United States v. Mendez*, 514 F.3d 1035, 1041 (10th Cir. 2008), but view the evidence in the light most favorable to the government, reversing only if no rational jury could have found the evidence sufficient to convict beyond a reasonable doubt.  *United States v. Brown*, 200 F.3d 700, 704–05 (10th Cir. 1999); *United States v. Haslip*, 160 F.3d 649, 653 (10th Cir. 1998).  As the district court observed, this was a close case, but in the end, we must affirm the convictions.

The district court summarized the relevant evidence against Mr. Phillips:

The Government's evidence against defendant James Phillips presents a closer question.  The only specific evidence of his participation in the making of a false writing came from former employee Odelia Bryer, who gave her opinion that the hand-printed name of Elpidia Solorazano on the applicant signature line . . . appeared to be Jim Phillips' handwriting.  She also identified the defendant's signature just below Ms. Solorazano's purported signature, in a provision where the defendant, as the preparer of the form, ostensibly adopted a declaration stating in part that "she [the applicant] signed the application in my presence."  Ms. Solorazano testified that it was not her signature on the application.  The Government also presented evidence, albeit circumstantial, of Mr. Phillips' knowledge of and assistance in other acts of making or using false writings.  Among other things, the Government presented evidence that the defendant was married to Ms. Morales-Phillips and

---

[2]  Though we have already reversed on Counts 2, 4, 6, 8, 10, 12, 14, and 16, we must nonetheless evaluate whether there was sufficient evidence to prove guilt on those counts.  If there is not, then the government is barred from reprosecution under the Double Jeopardy Clause.  *Burks v. United States*, 437 U.S. 1, 14-17 (1978).

was working with her during the same period the forged applications were being made and submitted, that he was the only lawyer in the Phillips' law offices, that Ms. Morales-Phillips was regularly engaged in the preparation of these forms, that Ms. Morales-Phillips used the Phillips law offices to meet with employers and aliens who were seeking certification, that this work was generating payments to the law firm from employers, that Ms. Morales-Phillips informed Ms. Burbridge that her work on the ETA 750's was being done for her husband James Phillips, that James Phillips and/or the Phillips law firm were listed as the representatives of the employers on these forms, and that on account of Mr. Phillips being so listed the Kansas foreign labor office notified him by mail of the filing of the applications and Ms. Burbridge spoke to him by telephone on occasion.

Dist. Ct. Op. 16-17. The court continued:

Under the evidence presented, the jury drew a permissible inference that he was a willing participant in a joint scheme to use forged signatures on the labor certification applications and the application for asylum. And as to Counts 5 and 6 of the Indictment, the chain of circumstances would allow the jury to find that the defendants either made the alteration or aided and abetted in the alteration as part of the same course of deceptive conduct shown on the other counts.

R. Vol. II, Doc. 59, at 18.

We easily discard Mr. Phillips' argument with respect to the I-589 asylum application (counts 15 and 16). Ms. Solorazano testified that she did not sign the forms, nor did she give anyone authority to sign the forms on her behalf, providing the jury with more than enough evidence to find that the forms were forged. Ms. Bryer, a former law firm employee, testified that the applicant signature was in Mr. Phillips' handwriting. While Mr. Phillips' ex-wife testified for the defense that it was not his handwriting, we must view the evidence in the

light most favorable to the government and therefore credit Ms. Bryer's testimony. This is sufficient to link Mr. Phillips to the forgery of the I-589 form.

As to the remaining counts, the district court found that Mr. Phillips was liable under an aiding and abetting theory. To be held liable for aiding and abetting under 18 U.S.C. § 2, the defendant must have: (1) associated himself with a criminal venture, (2) participated in the venture as something he wished to bring about, and (3) sought by his actions to make it succeed; and (4) someone must have committed the core offense. *See United States v. Hanson*, 41 F.3d 580, 582–83 (10th Cir. 1994). "A defendant may not stumble into aiding and abetting liability by inadvertently helping another in a criminal scheme unknown to the defendant; rather, a defendant must 'willfully associate [herself] with the criminal venture and seek to make it succeed through some action on [her] part.'" *Id*. at 582–83 (quoting *United States v. DeLuna*, 10 F.3d 1529, 1533–34 (10th Cir. 1993)). With the exception of the A.J. Kramer document, which we examine separately, the evidence against Ms. Morales-Phillips was strong, and we therefore do not doubt that the government established the fourth element.

We begin with Mr. Phillips' position as the sole lawyer in a small law firm. Contrary to intimations in the government's argument, this would not be enough, in itself, to support the conviction. A reasonable jury could not infer from the mere fact that Mr. Phillips was the only lawyer in the office that he was aware of every illegal action committed by his employees and that he approved, or even

encouraged, those actions. Such an inference would subject the supervising lawyers in law firms to something approaching strict criminal liability for the acts of their employees. To be sure, a lawyer generally has a duty under rules of professional responsibility to closely supervise his employees, and a failure to ensure compliance with all laws might constitute negligent supervision subjecting him to a bar investigation or, perhaps, civil liability. Moreover, a jury is entitled to take it into consideration when the profits of a criminal activity accrue to a law firm headed by only one lawyer. But in a criminal case, the jury cannot presume, without any direct evidence of the nature of his supervision of firm employees, that a lawyer acted in conformity with professional rules. The government makes no claim that it offered proof regarding Mr. Phillips actual supervision of his employees. We permit a jury "to draw reasonable inferences from basic to ultimate facts," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), but inferring that Mr. Phillips' closely supervised all employees' actions, without proof, comes close to the "speculation and conjecture" that we do not permit. *United States v. Isaac-Sigala*, 448 F.3d 1206, 1210 (10th Cir. 2006) (citing *United States v. Jones*, 49 F.3d 628, 632 (10th Cir. 1995)).

In this case, however, the guilty verdict was based on more than Mr. Phillips' position of authority in the law firm. First, the relationship between Mr. Phillips and Ms. Morales-Phillips was not just a working one, but also one of husband and wife. Although a spouse is not liable, without more, for the criminal

acts of his or her marriage partner, the combination of Mr. Phillips' position as the only lawyer in the firm and his status as spouse of a person within the firm who was a proven wrongdoer, comes closer to being sufficient evidence that he associated himself with her criminal activities.

The third element in the proof, Mr. Phillips' forgery of the I-589 application on behalf of Ms. Solorazano, tips the balance. Once the jury concluded that Mr. Phillips forged one asylum application, it was reasonable for the jurors to conclude that he was aware that additional forgeries occurred in his office. This proven act of forgery makes it unlikely that Mr. Philips was merely an innocent head of office under whose nose his wife and employee carried on a forgery scheme without his knowledge or connivance.

The government also was required to prove, however, that Mr. Phillips participated in the venture and that he sought to make it succeed. Mr. Phillips' firm received notice from the immigration office when documents were filed, and he spoke on the phone with Ms. Burbridge when there was a problem with the applications. Because we conclude that the jury could reasonably infer that he had knowledge of the forgeries, we also must hold that it was reasonable to conclude that Mr. Phillips "participated in the venture" and "sought . . . to make it succeed" when he served as a reference and spoke to officials about what he knew were forged applications.

-25-

Even if none of these facts, taken alone, would be sufficient proof to uphold Mr. Phillips' convictions, the combination of his position as the sole lawyer in the law firm in which the criminal activities took place, spouse of the wrongdoer, active participant in at least one forgery, and contact with government officials regarding questions about the applications, provides an evidentiary basis sufficient to support the jury's verdict that Mr. Phillips was an aider and abettor. This is, of course, not the required inference, and it may not be the one that we, sitting as jurors, would make. But our role today is only to determine whether a rational jury could come to this conclusion, and "a jury has wide latitude to determine factual issues and to draw reasonable inferences from circumstantial evidence." *Summers*, 414 F.3d at 1295 (citing *United States v. McCarrick*, 294 F.3d 1286, 1293 (11th Cir. 2002).

We draw the same conclusion for counts five and six, which involve the Kramer documents. The only difference between these two counts and the other ETA-750 charges is that the government's proof that Ms. Morales-Phillips was the individual who changed the date on the document was minimal, whereas the proof that she forged the other documents was quite strong. If she did not alter the date, then Mr. Phillips cannot be held liable on an aiding and abetting charge. If there is sufficient proof of her involvement, however, then the same chain of events that supported Mr. Phillips' conviction on the other counts is equally applicable here.

The district court found that:

> the evidence showed that after Ms. Burbridge sent the original form back to the Phillips law firm, the date was altered and the form was submitted to the Missouri office. The evidence showed that Ms. Morales-Phillips was regularly engaged at the Phillips' law firm in the preparation and submission of these forms, and her knowledge and fraudulent intent are amply demonstrated by evidence of her conduct in knowingly forging and falsely using signatures on a number of other applications.

Dist. Ct. Op. 16.

We are wary of holding that simply because Ms. Morales-Phillips forged other documents, she similarly altered the date on this one. However, Ms. Morales-Phillips acknowledged handling the A.J. Kramer application and she claimed that A.J. Kramer actually signed the form on the second date. This was highly improbable given that Mr. Kramer was dead at that time. From this lie, the jury might infer that she was covering up her own illegal activity. Further, it is natural for the jury to infer that the person who handled the application—Ms. Morales-Phillips—was also the individual who altered the date on the document. There was therefore sufficient proof that she was the one who amended the document in Mr. Kramer's name, without his authorization. Once Ms. Morales-Phillips is implicated, then Mr. Phillips' liability follows in the same manner as on the other charges.

For these reasons, we **REVERSE** the defendants' convictions under 18 U.S.C. § 1546 (a), and **AFFIRM** all other convictions. The case is **REMANDED**

to the district court for resentencing or such other proceedings as are consistent with this opinion.