**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 29, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

MARIANO A. HERRERA,

    Defendant-Appellant.

No. 12-3226

(D.C. No. 6:11-CR-10074-EFM-3)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **HARTZ**, **BALDOCK,** and **GORSUCH**, Circuit Judges.

A jury convicted Defendant Mariano A. Herrera of aiding and abetting the possession with the intent to distribute in excess of 400 grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii) and 18 U.S.C. § 2 (Count One) and conspiracy to distribute in excess of 400 grams of methamphetamine (Count Two) in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A)(viii) and 18 U.S.C. § 2. The district court sentenced him to concurrent terms of 120 months imprisonment. On appeal, Defendant challenges the sufficiency of the evidence underlying his convictions. Our jurisdiction arises under 28 U.S.C. § 1291. For the

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

reasons set forth below, we affirm.

## I.

Detective Eddy Padron of the Wichita, Kansas police department worked undercover in the Special Investigations Narcotics Unit investigating drug transactions. Working with Immigration and Customs Enforcement agents, a confidential informant placed Padron in contact with Sergio Alvarez ("Alvarez"), a co-defendant in this case.[1] Padron met the confidential informant and Alvarez at Alvarez's residence. At this meeting, Alvarez agreed to provide Padron with a sample of the drugs. Alvarez made a telephone call to a "guy" to bring the sample. Padron testified this "guy" was Defendant, although Defendant denies being the person who took the call. Defendant arrived at Alvarez's house driving a red Saturn coupe with Kansas license plates. Padron testified the license plate was registered at what he believed to be Defendant's address.[2] Alvarez and Padron walked up to the driver's side of the car and Defendant handed Alvarez a bag containing the sample of crystal methamphetamine. While he was within five feet of Defendant, Padron then asked whom he should call after examining the sample. Padron said he

---

[1] The district court held one trial for Defendant and Alvarez. Prior to the trial, Alvarez pleaded guilty to Count One and went to trial only on Count Two. Alvarez filed a separate appeal, United States v. Alvarez, No. 12-3238.

[2] Defendant argues the Government never presented testimony as to ownership of the red Saturn. Padron believed Defendant lived at a specific address because the tag on the car came back to that residence. If the Government had evidence the car was registered to Defendant, the Government did not present it to the jury.

agreed with Alvarez and Defendant that he would call Alvarez the next day.

True to their agreement, Padron called Alvarez the next day and suggested that they meet at Defendant's house because Alvarez lived in a dangerous neighborhood. Instead, Alvarez picked a QuikTrip convenience store. Defendant drove Alvarez in the red Saturn to the QuikTrip to meet Padron. Alvarez approached Padron and expressed concern about a Wichita police helicopter flying in the area. As a result, they agreed to change locations and meet at a car wash. When Pedron arrived at the car wash, he observed Defendant was driving Alvarez and Alvarez's daughter. Defendant then left. Alvarez told Padron that Defendant was going to retrieve the methamphetamine. Padron noticed the red Saturn now had a Georgia license plate. Approximately 25 minutes later, Defendant returned to the car wash with Alvarez's brother and co-defendant, Mario Alvarez ("Mario"). When Mario exited the passenger seat, Padron immediately observed a big bag in Mario's shorts pocket. Mario began to pull the bag out of his pocket, but Padron told him not to display it in the open. By this point, Padron had given the "bust signal" to the police, alerting them the methamphetamine was present. Alvarez directed Defendant to open the trunk of the Saturn. Padron, Alvarez, Mario, and Defendant were all within a five-foot space and Mario produced the methamphetamine and placed it in the trunk of the car. The police then came on the scene and arrested the men. In the process of the arrest, Mario disposed of a scale, disguised to look like a smart phone. At trial, a forensic chemist testified the methamphetamine seized from the trunk of

3

the Saturn weighed 436.0 grams and was 95% pure.

## II.

Defendant claims the evidence was insufficient to support his convictions because the Government presented no direct or circumstantial evidence from which a jury could reasonably infer Defendant was guilty beyond a reasonable doubt. We review de novo the district court's denial of Defendant's motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. See United States v. Vigil, 523 F.3d 1258, 1262 (10th Cir. 2008). We review the evidence, both direct and circumstantial, in a light most favorable to the Government. United States v. Kieffer, 681 F.3d 1143, 1152 (10th Cir. 2012). The evidence need not "convince a trier of fact beyond *all* doubt," rather, the evidence "need only reasonably support the jury's finding that the defendant is guilty of the offense beyond a reasonable doubt." Id. We have repeatedly emphasized that the evidence, "together with the reasonable inferences to be drawn therefrom, must be substantial, but it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." Id. (internal quotation marks omitted). We first address Defendant's conviction for aiding and abetting the possession of methamphetamine before turning to his conviction for conspiracy.

## A.

To find Defendant guilty of aiding and abetting under 18 U.S.C. § 2, the jury had to conclude Defendant: "(1) associated himself with a criminal venture, (2)

4

participated in the venture as something he wished to bring about, and (3) sought by his actions to make it succeed; and (4) someone must have committed the core offense." United States v. Phillips, 543 F.3d 1197, 1209 (10th Cir. 2008).

Based on the facts, we have no doubt the Government established the fourth element—that someone possessed methamphetamine with the intent to distribute the drug. But what about Defendant's role in the offense? First, we look to the events surrounding the initial delivery of the .05 gram sample of methamphetamine. Defendant delivered this sample of methamphetamine to Alvarez and Pedron. Defendant argues the Government produced no evidence to indicate where that sample came from or if Defendant knew it was methamphetamine. Furthermore, Defendant asserts Padron had no knowledge of whether he was the person Alvarez called to bring the sample. But Padron testified that Alvarez had called "the guy to bring the sample." App'x, vol. 3, 355–56, 417. Padron said "the guy" was Defendant and "the sample" was .05 grams of methamphetamine. The jury could infer that Defendant was knowingly transporting the methamphetamine based on Padron's testimony. Because of where Defendant was bringing the sample and to whom, the jury could reasonably infer Defendant knew that the delivery was part of a larger drug deal.

Even if the jury did not credit Padron's testimony that Defendant was "the guy," Defendant was present for the discussion regarding the next day's drug deal. Defendant argues Padron's opinion of whether Defendant might have heard the

5

conversation was speculation. Although Defendant may not have been present for the entire conversation, Padron's testimony reveals Defendant was present for a portion of the conversation regarding the bigger deal scheduled for the next day. Even though no one mentions the drugs by name at that point, Alvarez asked if Padron wanted "to do it" tomorrow or now. Padron responded, "Let's wait until tomorrow." Padron said because he did not know whether Alvarez or Defendant was in charge, he asked them who to call, "you [Defendant] or him [Alvarez]," regarding the next purchase of methamphetamine. Id. at 421. Padron testified "they" [Defendant and Alvarez] told him to call Alvarez. On direct, Padron said Defendant was the person that told him to call Alvarez, but on cross-examination, he stated he believed it was Defendant, but someone else could have answered his question. This conversation allows the jury to reasonably infer Defendant knew he was providing a sample to facilitate a bigger deal, was a knowledgeable participant in Alvarez's business, knew that Padron was a prospective customer, and knew of the larger drug deal and its details.

Next, the Government presented evidence that Defendant drove Alvarez to the drug deal. Id. at 384. Defendant argues that no drugs were present in the car at that time and Alvarez brought his young daughter, facts which would suggest Defendant had no knowledge of an impending drug deal. And even if he did have knowledge of the crime, Defendant asserts such knowledge does not prove beyond a reasonable doubt, or permit the reasonable inference that he was either a party to the deal or that

6

he had the necessary intent to join in the conspiracy or had the intent to aid and abet in the possession of methamphetamine. Defendant attempts to compare his case to United States v. Ogando, 547 F.3d 102 (2d Cir. 2008). But the facts of that case are different. The defendant in Ogando was a taxi driver for hire that the members of the conspiracy used. His actions were not unusual for a taxi driver. In this case, Defendant drove two drug dealers and delivered drugs. The fact that Defendant drove Alvarez to the convenience store and to the carwash allowed the jury to infer that Defendant knowledgeably associated himself with the drug deal and facilitated its success.

In addition, the jury learned the license plates on the red Saturn were changed from Kansas tags to Georgia tags before the drug deal. Defendant asserts the Government did not present any evidence at trial to show who owned the Saturn. But Padron testified that Defendant lived at a specific address because that is where the Saturn license plate was registered. App'x, vol. 3, 382. Padron also referred to the Saturn as "his [Defendant's] red two-door Saturn." Id. at 451. Therefore, the Government presented evidence only in the form of Padron's beliefs. The jury, however, did not hear any conflicting testimony as to the ownership of the Saturn. Even if the jury could not infer that Defendant owned the Saturn and personally changed the license plate, the jury could infer Defendant knew the license plate changed because he was driving the car. Defendant further argues that an out-of-state license plate draws police attention to the vehicle, rather than minimizing it.

7

Padron testified that people sometimes place fake license plates on cars to distract police because the plates are untraceable. Id. at 388. The jury could reasonably infer the license plates were changed because of the drug deal about to occur.

Finally, the Government presented evidence that Defendant left the car wash during the drug deal and returned with Mario, who had possession of the methamphetamine. Defendant argues that the jury could not infer he had knowledge of the drug deal from this fact. Defendant said Alvarez told him to pick up Mario and that Mario had possession of the drugs. Defendant contends that although driving Alvarez and Mario may have provided "suspicious circumstances," the fact did not permit a reasonable inference that Defendant was either aiding and abetting the possession of the drugs or was a member of the conspiracy. We disagree. Defendant's actions could lead a jury to infer that he had knowledge of the circumstances.

Taking all these facts in a light most favorable to the Government, we conclude that the jury had sufficient evidence to find beyond a reasonable doubt that Defendant associated himself with Alvarez's venture to distribute methamphetamine, wished to bring about the venture, and sought by his actions to make the venture succeed.

B.

We turn to Defendant's challenge to the sufficiency of the evidence regarding his conspiracy conviction. "To obtain a conspiracy conviction, the government must

8

prove: (1) an agreement by two or more persons to violate the law; (2) knowledge of the objectives of the conspiracy; (3) knowing and voluntary involvement in the conspiracy; and (4) interdependence among co-conspirators." United States v. Cornelius, 696 F.3d 1307, 1317 (10th Cir. 2012) (internal quotation marks omitted). The Government may show interdependence where "a defendant's activities facilitated the endeavors of other alleged co-conspirators or facilitated the venture as a whole." United States v. Acosta-Gallardo, 656 F.3d 1109, 1124 (10th Cir. 2011).

The facts recited above likewise support the jury's verdict on Defendant's conspiracy conviction. Taking the facts in a light most favorable to the Government, the jury could infer that Alvarez and Defendant entered into an agreement to distribute the methamphetamine to Padron. Defendant's presence at the conversation the day before the drug deal provided him with knowledge of the larger drug deal. Defendant's decision to drive Alvarez and Mario and to deliver the methamphetamine proves Defendant's involvement in the conspiracy. Finally, Alvarez, Mario, and Defendant acted together for their shared mutual benefit. As the district court pointed out, the Government's evidence cast the three individuals in the roles of "a wheelman, a bagman, and a lipman." Accordingly, the jury could find beyond a reasonable doubt Defendant conspired to possess and to distribute methamphetamine.

9

AFFIRMED.

Entered for the Court,


Bobby R. Baldock
United States Circuit Judge